Neville L. Johnson (SBN 66329)
Jordanna G. Thigpen (SBN 232642)
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
Email: njohnson@jjllplaw.com
       jthigpen@jjllplaw.com

*Attorneys for Defendant*
PEN Music Group, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCU MUSIC COMPANY, INC., a Louisiana corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PEN MUSIC GROUP, INC. a/k/a Songs of Pensive Music, a Colorado corporation; and MICHAEL EAMES, an individual,<br><br>Defendants. | Case No.: 2:18-cv-65651-RGK-JC<br>Related Case No. 2:18-05201-RGK-JC<br><br>**DECLARATION OF MICHAEL EAMES IN SUPPORT OF PEN MUSIC GROUP, INC.'S OPPOSITION TO PLAINTIFF MARCU MUSIC COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Action filed: July 30, 2018<br><br>**Date: October 1, 2018**<br>**Time: 9:00 A.M.**<br>**Judge: Hon. R. Gary Klausner**<br>**Courtroom: 850**<br><br>[*PEN's Opposition Memorandum of Points and Authorities; Statement of Genuine Disputes*; *Objections to Evidence*; *Declarations of Jordanna G. Thigpen and Debra Wise filed concurrently herewith*] |

## DECLARATION OF MICHAEL EAMES

I, Michael Eames, declare:

1. I am the President of PEN Music Group, Inc. ("PEN"). Except as otherwise indicated, I have personal knowledge of the matters set forth below and could competently testify thereto if called to do so. I make this declaration in my capacity as the President of PEN Music Group, Inc. and on its behalf. I also make this declaration on my own individual behalf where indicated.

2. PEN is a Colorado corporation and a music publishing company that manages individual musical compositions or catalogues of musical compositions for its clients. I have worked in the music publishing business for over 27 years; PEN has existed for 24 years. I am currently the president of the Association of Independent Music Publishers (AIMP), a 40-year-old US-based organization, and I was Vice President from 2013-14 and ascended to the presidency in 2014. I am also one of 14 individuals nationwide who were personally appointed to the Independent Publishers Advisory Council (IPAC) to the Washington, DC-based National Music Publishers Association (NMPA), which as of last year celebrated its 100th anniversary of representing US-based music publishers.

3. As set forth below, I am attaching email correspondence which I received from (1) Carol Markowitz and Donald Markowitz, and (2) various other third parties, and (3) sent by me, in the course of my work at PEN, and which relates to Plaintiff Marcu Music Company, Inc. ("Marcu") and the events and transactions involved in this lawsuit and my counterclaims, which will be filed with my answer. These emails were each made and received at the time indicated on each email. These emails have been kept in the course of PEN's regularly conducted business activities, including its business activities with Marcu and its principals. It is the regular practice of PEN to generate and receive emails, including the emails attached to this declaration.

**The PEN/Marcu Relationship**

4. Marcu and PEN entered into an Administration Agreement (the "2011 Agreement") on January 1, 2011. I executed the 2011 Agreement on behalf of PEN. Marcu's principal, Donald Markowitz ("Donald"), executed the 2011 Agreement on behalf of Marcu. I will refer to Donald and his wife Carol Markowitz by their first names to avoid confusion, and no disrespect is meant.

5. Marcu is a corporation that holds a 12.5% interest in a song known as "(I've Had) The Time of My Life," and an 8.33% interest in a derivative work "The Time (Dirty Bit)" (collectively referred to as the "Title"), the first of which was created for and used in the film *Dirty Dancing*. The film was a wild success, and the Title has been licensed frequently since the film's release, generating revenue for Marcu and others who hold various interests in the Title.

6. The 2011 Agreement was a standard agreement that PEN executes with its clients for whom we provide a sum of money as an advance. The 2011 Agreement provided that PEN would serve as the "administrator" of the Title and would handle licensing requests, collect revenue, and perform other duties related to administration of the publishing rights in the Title. In my experience as a music publisher, licenses are commonly issued for musical compositions to be used in advertisement or in connection with other brand promotion, for use in film or television, for public awareness campaigns, and many more common reasons. Over the past six years, licenses have been issued for the Title involved in this case for those purposes, and PEN has issued and administered those licenses.

7. A rights holder in a musical composition cannot have more than one administrator at the same time for its share of any particular piece of property, because licensees need to know where to direct their inquiries when they want to license any particular property. If there are two administrators for any one share of a particular piece of property, there could be problems with licenses made simultaneously to industry competitors, for example (*e.g.*, Coca-Cola and Pepsi

both licensing the title from different administrators at the same time). For that reason, PEN's agreements with its clients – including the 2011 Agreement at issue in this case – specifically provide that PEN is the exclusive administrator.

8. I have known Donald since 2007 when we were introduced by a mutual friend with a different music publishing company. I assisted Donald and the other company with ensuring Marcu's rights to the song were listed appropriately with the various performing rights organizations around the world, among other issues. In 2009, Marcu executed its first agreement with PEN.

9. At the time Marcu agreed to contract with PEN, I was aware that Donald had previously been married to Debra Wise ("Wise") for a number of years, but had divorced, and Donald re-married to Carol Markowitz ("Carol"). I am also aware, since as stated above, I have known Donald for many years, Wise and Donald were involved in a protracted Los Angeles Superior Court battle in family court. Eventually, Donald was ordered by the state family court to pay hundreds of thousands of dollars in child support and attorneys' fees to Wise, which I know because of the circumstances described herein. I also know from my administration of the respective interests (PEN began to administer Wise's share of the Title as of October 1, 2014) that as part of the separate divorce proceedings, Donald's original 25% interest in the Title was split in half, with 12.5% going to Wise via her Re'eh, Inc. d/b/a Calspen Music ("Calspen"), and 12.5% remaining with Donald such that he established Marcu to put that share into it.

10. Many musical compositions that PEN administers are not owned wholly by one person, and it can be difficult and time consuming for potential licensees to obtain approval from all rights holders. In my twenty-seven years' experience as a music publisher, if a licensee knows it only has to contact one or just a few publishers to license a musical composition, it is more likely to use a particular title. When Calspen first contracted with PEN in October 2014, both Donald and Wise expressed to me their satisfaction that the full 25% interests in the Title would be

administered by PEN, and both expressed to me that they knew it would make it easier to license the Title with the full 25% interest in the Title joined at PEN.

11. Though PEN had represented Marcu since 2007, at the time Donald contracted with PEN in 2011, he was badly in need of funds as he said he needed money to buy a house in New Orleans that he and Carol and their new family were moving to. He told PEN that Marcu would only agree to continue its relationship with PEN if PEN could provide Marcu with a substantial advance against the future royalties to be earned during the term of the Agreement. PEN agreed, arranged for outside financing, and advanced Marcu $500,000 against royalties to be earned pursuant to the 2011 Agreement.

12. The 2011 Agreement had a term of 1/1/11-12/31/15. On November 28, 2012, the Agreement was amended (the "Amendment") to extend the initial term through April 1, 2017, with a one-year Post-Term Collection Period. In connection with the Amendment, Marcu requested and received another advance of $150,000. In total, Marcu requested and received advances of $650,000 against its royalties. During the entire six-year-and-three-months initial period, Marcu never once expressed any dissatisfaction with PEN's services. Marcu also never complained about statements or funds being late, even though many quarterly statements and the corresponding funds were sent after the 45-day period following each quarter had elapsed.

**The 2017 PEN/Marcu Agreement at the New Percentages**

13. In January 2017, Carol Markowitz, Marcu's representative (and Donald's new wife), wrote to ask PEN what new administration fees Marcu would receive once the existing 2011 Agreement ended, if Marcu agreed to stay for another five years. Carol wanted lower rates than Marcu was currently paying (20% domestic/25% foreign) and Eames decided to offer the same rates enjoyed by Wise's entity (which had never received advances, and enjoyed rates of 7.5% domestic/15% foreign), plus providing PEN a 60-day period to provide accountings

after the expiration of each quarter, instead of 45 days. PEN wrote back the same day and agreed to give Marcu the same rates that Wise's entity received (the "New Percentages"), since at that time, Marcu was not planning to obtain any advance from PEN. Carol responded on January 17, 2017 that "this generally sounds good, but I will get back to you on this after I've had some time to do some diligence on my end." On March 2, 2017, Carol responded again in writing to my January 17, 2017 offer, confirming that the new splits would apply to "ALL income – e.g., synch?" and then on March 3, 2017, wrote "Better yet, can you send us a draft agreement that outlines the new terms effective April 1 for our review and signature?" A true and correct copy of the emails comprising this exchange, with the relevant emails highlighted for review, is attached hereto as **Exhibit A**.

14. In subsequent telephone calls occurring prior to March 28, 2017, PEN and Carol agreed to the New Percentages and the new accounting period, and also agreed that PEN would forego the Post-Term Collection Period and start the New Percentages at the beginning of the second quarter of 2017 in consideration for Carol's agreement to continue the relationship for another five years, and that all other terms in the 2011 Agreement would remain in place (the "2017 Agreement"). As of April 1, 2017, PEN began accounting to Marcu at the New Percentages and did not apply the Post-Term Collection Period. The only reason that PEN did so is because Marcu had agreed to a new five-year term. If it had not agreed to do so, I would never have agreed that PEN would forego the Post-Term Collection Period.

**Carol Markowitz Asks Michael Eames to Facilitate a Settlement of Judgments from An Unrelated Matter**

15. On March 28, 2017, Carol wrote to me and asked me to facilitate a settlement between Donald and Wise pertaining to outstanding judgments from the Los Angeles Superior Court's Family Court division owed by Donald to Wise, which then totaled approximately $240,000 (including penalties and interest). A true and correct copy of Carol's email to me is attached as **Exhibit B**. I agreed to

facilitate the settlement; since I was familiar with both Debra and Donald and had known and interacted with both of them for many years, I felt confident I could help them resolve their differences and both Donald and Wise had come to trust my experience and judgment.

16. Carol called me later that day to thank me and give me her personal thoughts on the strategy of settling with Wise. She told me she was going to send me a "dummy" termination letter referencing termination of the 2011 Agreement, but specifically stated on the call that it was invalid, had no meaning, force and effect, and that I should ignore it, and it was only to be brandished if necessary as part of any submission tactic to force Wise to agree to the terms that Donald wanted in the settlement. She stated that she knew Wise did not want Marcu's interest to leave PEN, and instructed me that if I had to show Wise the termination letter, I should also tell Wise that Marcu's plan was to get a large advance on Marcu's royalties from another administrator, which would then place Wise's lien against Marcu's royalties to pay off the judgments in an inferior second position to the lien from the new administrator.

17. Later that day, she emailed an unsigned letter (what Marcu is calling the "Termination Letter") to me with the subject line "per our call." I responded "Thank you! And I am seeing Debra at 10:30 a.m. tomorrow here at the office" Had I not spoken to Carol on the phone earlier, and had she not affirmed our agreement for PEN to continue its relationship with Marcu, and advised me that the unsigned letter was of no force and effect, I would never have responded in this manner, and there would have been no reason to mention the fact that I was meeting Debra, as I would never have agreed to mediate the dispute if Marcu was actually terminating and not just sending me a prop letter to be used in the mediation. A true and correct copy of my response is attached hereto as **Exhibit C**.

**Marcu Reaffirms the 2017 PEN/Marcu Agreement**

18. During this same call, Carol also told me that Marcu was unequivocally

agreeing to another term of five years for administration with PEN on the same terms as those reflected in the existing Agreement, except that Marcu would receive the New Percentages rather than the old commission of 20% domestic/25% foreign and that the Post-Term Collection period would not apply and I would start 2Q17 with a clean break at the New Percentages (the "2017 Agreement"). I confirmed to her that was our agreement.

19. I met with Debra on March 29, 2017, the day after my call with Carol. During my meeting with Debra, I explained that Carol and Donald wanted me to act as a mediator for the Wise/Donald dispute. Debra agreed that I should serve in that capacity. I also told Debra the truth: that Marcu had agreed to another five-year term. Debra indicated that she was pleased since the Title is easier to license with fewer administrators.

20. I then immediately began working with Donald (with Carol mostly communicating on his behalf) and Wise to secure a settlement.

21. I never addressed the purported "Termination Letter" or referenced Marcu's "termination" during the period I was attempting to secure a settlement, or at any other point for any reason, because Carol had told me it was not actually a termination letter, that it was of no force and effect, and she was only sending it as a tool for me to use in Donald's settlement negotiations with Wise and that she would sign the 2017 Agreement once Debra settled. In fact, I never used the letter in this manner or for any other purpose, and I never showed it to Wise, as I did not feel it was appropriate to use a false document in the manner requested by Carol. To the contrary, I disregarded Carol's strategy of "threatening" Wise as ineffective, malicious, and ultimately counter-productive. I told Wise repeatedly during the settlement process that Marcu had already agreed to stay with PEN for another five years, but that if she did not settle with Donald, it was questionable whether it would continue to do so after that point. However, I did not tell Carol I was disregarding her strategy, as I believed it would make her angry. If I believed the

"Termination Letter" was real (or that PEN's relationship with Marcu was terminating at any point), I would ***never*** have (1) charged the New Percentages, especially agreeing to have them become completely effective as of April 1, 2017 without regard for the Post-Term Collection Period in the 2011 Agreement; (2) worked hundreds of hours to secure the settlement between Donald and Wise; (3) held the money due to Marcu for 2Q17 and 3Q17 without paying it straight to Wise under the liens she had served on June 7, 2017; (4) encouraged Wise to compromise her judgments in the settlement; and (5) advanced over $400,000 to Donald in connection with the settlement. Neither PEN nor Marcu has prepared the "mutually agreed statement of all Compositions" that is to be done with termination.

**Michael Eames Secures a Settlement Between Donald Markowitz and Debra Wise**

22. I found out in June 2017 that Wise had hired a collections attorney, Richard Evanns of Evanns Collection Law Firm, who served a lien on PEN on June 7, 2017. I informed Donald of the lien once I returned from a business trip.

23. In addition to the child support and attorneys' fees judgements, Donald also owed $200,425 to City National Bank for a HELOC (the "CNB Debt") that he had taken out against the Markowitz family residence during the previous divorce proceedings, where Wise still resides with her children from her marriage to Donald. The Los Angeles Superior Court's Family Court division had found Donald (rather than Wise and Donald) personally liable for this debt. Around the same time that the lien was served on PEN, I found out in July 2017 from Carol that City National Bank had started enforcement procedures for the CNB Debt in May 2017.

24. Throughout the summer and fall of 2017, I worked very hard to secure Wise's agreement to the terms dictated by Donald. It was very difficult due to the years of acrimony between the parties, the lien, the CNB Debt, and Donald's ongoing need for funds. I spoke on the phone or met in person on a weekly,

sometimes daily basis with Wise. I spoke on the phone on at least a weekly basis with Carol. I exchanged dozens of emails with both Carol, Wise, and occasionally Donald. I also made telephone calls and exchanged correspondence with several third parties, including Richard Evanns, and representatives of other creditors. I performed all of this work in order to accomplish the settlement. Throughout this time, in my conversations with her, and in writing, Carol repeatedly reaffirmed the 2017 Agreement, and continually told me that the only way to accomplish the settlement was for PEN to make an advance from Marcu's yet-to-be-earned royalties due in 2018 and beyond. True and correct copies of examples of such communications are attached hereto as **Exhibits D-E**, with the relevant portions highlighted.

25. Ultimately, on November 27, 2017, Wise executed a settlement agreement (the "Settlement Agreement") with Donald that reflected Donald's requested terms (requiring that Wise substantially compromise her judgments by approximately $50,000), and PEN agreed to advance $400,424.74 on Marcu's behalf for the benefit of Donald. A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit F**.

26. I signed the Settlement Agreement because PEN was advancing the money from Marcu's royalties that would be used to satisfy the settlement. Paragraph 2(a) of the Settlement Agreement states: "Parties agree the Settlement Amount shall be paid on behalf of the Debtor Donald Markowitz by PEN, and that all such monies paid shall be considered "advances" as outlined in the Agreement between PEN and Donald Markowitz." I understood that this referred to the 2017 Agreement. On November 26, 2017 and November 28, 2017, Carol sent comments on the Settlement Agreement back to Richard Evanns, who had volunteered to formally draft it, (copying me on her correspondence), but none of her comments asked for clarification on Paragraph 2(c) or attempted to modify it in any way. A true and correct copy of Carol's comments is attached hereto as **Exhibit G**.

27. Except for PEN's obligation to advance the funds, and the reference to the Agreement between Marcu and PEN, neither PEN nor myself have anything to do with the underlying litigation or the claims settled in the Settlement Agreement, and we are not even parties to the Settlement Agreement. The Settlement Agreement specifically states on its first page in the preamble that "Eames and PEN Music Group are third parties to this litigation and not debtors, but agree to advance the settlement monies owed by the Debtor, as outlined below." Prior to the execution of the Settlement Agreement, neither myself individually, nor PEN as an entity, had any known claims against Marcu, Donald Markowitz, or Debra Wise. There is no Civil Code § 1542 waiver in the Settlement Agreement.

**Marcu and PEN Perform the 2017 Agreement**

28. Between April 2017 and December 2017, PEN continued to perform its services as administrator, sending Marcu eighteen (18) license requests for Marcu's 12.5% share approval from April 10, 2017 through December 5, 2017. Marcu never indicated it was contesting PEN's authority to act as its administrator, never informed PEN it was going to handle the licenses directly because the agreement had been terminated, never told PEN it did not have authority to license the Title, and *always* provided the necessary approvals. In fact, on October 26, 2017, when Donald threatened to withhold approvals on licenses until the settlement with Wise was executed, Carol quickly stepped in and requested that all approvals be sent to her – and thereafter, continued to grant them. A true and correct copy of that email exchange is attached as **Exhibit H**, and true and correct copies of Marcu's approval after October 26, 2017 are attached as **Exhibit I**. Meanwhile, PEN sent Marcu statements for the 2Q17 and 3Q17 that reflected $67,398.34 earned in royalties for 2Q17 and $71,558.74 earned for 3Q17, less PEN's administration fee, which PEN calculated at the New Percentages, per the 2017 Agreement. Marcu accepted those statements.

**PEN Receives a Wire Transfer and Learns of Marcu's "Termination" for the First Time**

29. On December 21, 2017, I was surprised to receive a $216,772.61 wire transfer from Marcu to PEN's account. Carol had previously mentioned that she would be selling her separate property condominium and using the proceeds to pay down the money PEN had advanced. I believed, upon receiving the wire transfer, that the condominium had sold and she was honoring her promise, even though Carol had previously stated that she did not think she would realize more than $100,000 from this sale. The next day, however, I received a letter from Marcu, claiming that the wire transfer supposedly constituted full and final payment of all monies "loaned" by PEN to Marcu. Marcu had apparently arrived at this amount by taking the $400,424.74 advanced by PEN on Marcu's behalf on December 1, 2017, and deducting (a) the 2Q17 and 3Q17 royalties ($138,957.08); (b) an estimate PEN had provided to Marcu of $40,000 that would become due for the yet-to-be-rendered statement for 4Q17; and (c) PEN's fees at the New Percentages for all three quarters.

30. The December 22, 2017 letter also stated that Marcu had entered into an agreement with Kobalt Music Group ("Kobalt"), a third party music administrator and competitor of PEN's, on December 15, 2017 (i.e., during the precise time that PEN was in contract with Marcu). PEN considers this a breach by Marcu of its agreement for PEN to continue as the administrator for another five years. Donald and Carol represented to Wise, Wise's attorney Richard Evanns, and myself during the settlement process that Donald and Carol were insolvent (even with the condominium sale proceeds purportedly coming from Carol). Because Marcu was somehow able to provide for the December 21, 2017 wire transfer (and the wire transfer form provided to me with the December 22, 2017 letter indicated a $350,205.10 balance in Marcu's checking account), I was and remain certain Marcu

received a large advance from Kobalt in consideration for Marcu's purported contract with Kobalt, in which case Kobalt would claim a lien on any royalties earned by Marcu. I was appalled that Marcu would enter into an advance deal with Kobalt while still under contract with PEN and use Kobalt's money to purport to pay PEN. A true and correct copy of the wire transfer form provided with the December 22, 2017 letter is attached hereto as **Exhibit J**. I directed my counsel to inquire from Marcu whether Kobalt did make an advance, but I understand that Marcu refuses to provide any information.

31. Within one day of receiving the wire transfer, PEN started the process to secure counsel to attempt to resolve the dispute with Marcu. Though Marcu filed this action first, PEN has counterclaims which it will be filing with its answer in this action.

**PEN's Preparation of Accountings**

32. PEN has prepared accountings, calculated at the New Percentages per the 2017 Agreement, for Marcu for 4Q17, 1Q18, and 2Q18. On September 10, 2018, PEN sent the accountings to Marcu. They are also attached to this Declaration as **Exhibits K-M**.

33. Marcu's license revenue from the 2018 SuperBowl advertisement (which is actually only $8,125, representing Marcu's 12.5% share of a $65,000 fee for 100%) is mentioned in Carol Markowitz's Declaration. This revenue is not described in any PEN accounting because the NFL is still holding these monies, due to the ongoing dispute between the parties. PEN has not received any funds from NFL for Marcu in connection with this advertisement.

34. PEN is holding Marcu's royalties for 4Q17, 1Q18, and 2Q18 in a segregated account until further direction from the Court, owing to the ongoing dispute between the parties over how much money is owed to PEN, which I believe will exceed any revenue currently due to Marcu.

35. I have reviewed the declarations and evidence submitted by Marcu in

support of its motion for summary judgment and have the following further responses.

36. First, Exhibit 5 of the Carol Markowitz Declaration is a January 16, 2017 email from me to Carol. In that email I state "I believe that term expires on April 1st of this year." The 2011 Agreement provides for expiration on April 1 only after prior 30 day written notice, but also provides that the agreement will continue from quarter to quarter unless terminated. Further, that email was in response to Carol's request for a new deal which could only commence on April 1, 2017 at the earliest. In subsequent emails between Carol and myself, true and correct copies of which are attached as **Exhibit A** hereto, as well as our telephone calls in which we both accepted the terms, we were able to hammer out a deal at the New Percentages with the new 60-day accounting period.

37. Markowitz Exhibit 7 is an email from me to Carol in which I reference the New Percentages being applicable as of April 1, 2017 to Marcu's royalties, which is consistent with the 2017 Agreement. True and correct copies of the two emails I received from Carol on August 15, 2017 which caused me to respond in this manner is attached hereto as **Exhibit N**.

38. Carol also claims that she sent me an email on September 11, 2017 in which she referred to a "collection period," which she attaches as Exhibit 8 to her declaration. As of September 11, 2017, Wise still had a valid lien against royalties due to Marcu, and the settlement between Donald and Wise had not yet occurred. In her emails and telephone calls to me from August 2017 onward, Carol was becomingly increasingly desperate, agitated and anxious about the lack of a settlement, and regularly expressed to me her belief that Wise would never settle. During a telephone conversation that I had with Carol around the time this email was sent, Carol asked me once again if there was any way to use the "dummy" letter of March 29, 2017, this time to show Wise that the PEN agreement had terminated and the lien could not be enforced as to any royalties after April 1, 2017,

in order to gain an advantage in the negotiations and force Wise to settle. I told Carol that her plan would not work, as the lien would attach to any royalties received by PEN for Marcu, until the lien was satisfied, regardless of the date of the royalties. Therefore, when I received the September 11, 2017 email from Carol referencing the "collection period," I understood that she was referring to the potential use of the "dummy" letter.

39. There are several emails in Markowitz Exhibit 9, but to the extent Marcu seeks to reference the email I sent to Carol on November 22, 2017, in that email I indicate that per my prior agreement with Marcu, PEN was not going to raise its commission over and above the New Percentages even though PEN was making an advance, which would normally be cause for it to do so. I also expressed my hope that Marcu would "stay and not leave," in which I meant, after expiration of the five-year period we had agreed to (of which at that point, six months had already elapsed).

40. In the Carol Markowitz Declaration, Carol indicates that PEN never sent a written agreement for the 2017 Agreement. Both Carol, on behalf of Marcu, and myself on behalf of PEN discussed in writing and in telephone conversations whether or not PEN should take the time to formalize the 2017 Agreement in writing before the settlement agreement with Wise was signed. Our discussions centered around how much money PEN would have to advance and whether it was worth it to bother drafting it when we didn't know the exact amount PEN would need to fund for the Markowitz/Wise settlement. We also agreed numerous times during our telephone conversations and in written correspondence that, owing to the complexity and numerous hours of work that the settlement was demanding, the pro forma agreement would be signed after the settlement with Debra was finalized, and PEN had ultimately advanced the money for the settlement so that we could place the precise figure of the advance into the written agreement. This is why the Settlement Agreement referenced the separate agreement between PEN and Donald

pertaining to royalties that PEN was advancing against.  Another factor was whether Carol was going to be able to sell her condominium, which would reduce the amount advanced, so we agreed to simply wait until these events occurred.

41. Once I received the money on December 21, 2017, I then followed our plan, and sent the written agreement containing all the material terms (except that I made a typographical error as to the length of the term, providing only for a three-year term, but this would have been corrected had Marcu complied with its agreement to sign as it had always represented it would do). In the email I stated "As we discussed earlier this year, the new agreement we were to enter into as of April 1, 2017 is mirroring the agreement we previously negotiated and signed with Debra, the splits of which are the ones I initially emailed you on January 16th." By "the agreement we were to enter into as of April 1, 2017," I meant, "the agreement that would have been signed earlier in the year per the 2017 Agreement, *had we not mutually agreed that I would mediate the dispute with Wise and provide Marcu with an advance of over $400,000 in connection with the settlement*." A true and correct copy of the email and the written agreement are attached as **Exhibit O** hereto.  When I sent the written agreement on December 21, 2017, I had not yet received the letter from Marcu informing PEN that Marcu purported to contract with Kobalt and not PEN, and I had no idea that Marcu was claiming termination at any point.  That letter did not arrive until December 22, 2017.

42. ASCAP is the American Society of Composers, Authors and Publishers. It is a nonprofit organization that tracks performances, collects licensing fees when titles are publicly performed, and remits such fees to the designated administrator for any given title.

43. On April 25, 2018, ASCAP contacted PEN, Wise, Kobalt, and Carol to inquire about a discrepancy that ASCAP had noticed in its records: both Kobalt and PEN were listed as the administrator for Marcu's publishing rights interest in the Title.  Both PEN *and* Kobalt responded the same day indicating the existence of a

dispute between the parties. PEN stated "there is currently a dispute on [Marcu's] share" and highlighted an error that Kobalt had made in describing the percentage ownership description for their registration of the Title (Kobalt claimed the full 25% and not just Marcu's 12.5%). Kobalt responded "Kobalt maintains the claims listed on our submission below. This is an on-going dispute that we are aware of, and will let you know as soon as there has been any progress." Two days later, on April 27, 2018, Kobalt responded again and stated "We have reviewed the below and have updated our share," *confirming and acknowledging the error that PEN had highlighted*, and updating Kobalt's information to reflect PEN's correction. A true and correct copy of the entire thread on this issue, including Kobalt's response, is attached hereto as **Exhibit P**.

44. I declare, under penalty of perjury, under the laws of the United States, that the foregoing is true and correct and that this was executed on the 10TH day of September 2018 at Studio City, CA.

MICHAEL EAMES